FILED

2018 MAY 24  PM 3: 30

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2017 Grand Jury

UNITED STATES OF AMERICA,

　　　　　　Plaintiff,

　　　　　　v.

IRENA SHUT,
DOMENIC SIGNORELLI, and
ROBERT JOSEPH,

　　　　　　Defendants.

No. 18 CR 00315-RGK

I N D I C T M E N T

[18 U.S.C. § 371: Conspiracy;
18 U.S.C. §§ 981(a)(1)(A),
981(a)(1)(C), 982(a)(1),
982(a)(7) and 28 U.S.C. §
2461(c): Criminal Forfeiture]

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

I.　GENERAL ALLEGATIONS

At all times relevant to this Indictment:

A.　Defendants and Related Entities and Individuals

1.　Unindicted co-conspirator ("UCC") A and UCC-B formed
and caused the formation of TYY Consulting, Inc.
("TYY") in or about February 2011.

2.    TYY purported to provide "marketing consulting services" to pharmacies and had a registered address in Las Vegas, Nevada.  TYY engaged "marketing representatives" ("marketers" or "reps") to generate prescriptions of compounded drugs and/or other pharmaceuticals for New Age Pharmaceuticals, Inc.; Roxsan Pharmacy; Concierge Compounding Pharmaceuticals, Inc.; and Precise Compounding Pharmacy, Inc. (collectively, "the TYY-Affiliated Pharmacies").

3.    UCC-A, UCC-B, UCC-C, and UCC-D formed and caused the formation of Concierge Compounding Pharmaceuticals, Inc. ("Concierge") to fill compounded drug prescriptions generated by TYY "reps."  In or about November 2012, Concierge became fully operational in Nevada and the primary beneficiary of TYY's "marketing" efforts.

4.    Precise Compounding Pharmacy, Inc. ("Precise") was a pharmacy located in Culver City, California, within the Central District of California, formed in or about December 2008, by UCC-E, who was a pharmacist licensed in California. In January 2013, UCC-A, UCC-B, UCC-C, and UCC-D acquired ownership interests in Precise, which they fraudulently concealed so that UCC-E remained the only owner of public record for the pharmacy.  UCC-E also obtained a fraudulently concealed ownership interest in Concierge and TYY.

5.    UCC-F was a TYY marketer, based in Maryland, who, through "Meditech," was paid percentage-based commissions for facilitating the referral of prescriptions for compounded drugs and other items reimbursed by health care benefit programs to the TYY-Affiliated Pharmacies.  UCC-F was affiliated

with TYY, initially under an independent contractor agreement, and later under a sham consulting agreement with Concierge. UCC-G was initially an employee of UCC-F, and was later, at the request of UCC-F, designated as a purported employee of Concierge, so Concierge could pay UCC-G's employment wages for the benefit of UCC-F.

6.    UCC-H was a TYY marketer, based in Florida, who, through "DCMI," was paid percentage-based commissions for facilitating the referral of prescriptions for compounded drugs and other items reimbursed by health care benefit programs to the TYY-Affiliated Pharmacies.  UCC-H operated as an independent contractor with respect to TYY.

7.    UCC-I was a TYY marketer, based in California, who, through MCNAA, Inc., was paid percentage-based commissions for facilitating the referral of prescriptions for compounded drugs and other items reimbursed by health care benefit programs to the TYY-Affiliated Pharmacies.  UCC-I was affiliated with TYY, initially under an independent contractor agreement, and later under a sham employment agreement with Precise.  In order to fully compensate UCC-I for the large volume of his prescription referrals, without creating a suspiciously generous employment agreement, UCC-I, UCC-A, UCC-B, UCC-D, UCC-E, and others, arranged for compensation to be paid to UCC-I's wife through a fraudulent employment contract between Precise and UCC-I's wife.

8.    UCC-J was a TYY marketer, based in Alabama, who, through "Doc RX," was paid percentage-based commissions for facilitating the referral of prescriptions for compounded drugs and other items reimbursed by health care

1  benefit programs to the TYY-Affiliated Pharmacies.   UCC-J
2  operated as an independent contractor with respect to TYY.

3       9.   UCC-K was a TYY marketer who, through Associated DME,
4  Inc., was paid percentage-based commissions for facilitating the
5  referral of prescriptions for compounded drugs and other items
6  reimbursed by health care benefit programs to the TYY-Affiliated
7  Pharmacies.   UCC-K operated as an independent contractor and
8  generated prescription referrals from various states, including
9  Florida.

10      10.   UCC-L was a TYY marketer, based in Florida, who was
11  paid percentage-based commissions for facilitating the referral
12  of prescriptions for compounded drug and other items reimbursed
13  by health care benefit programs to the TYY-Affiliated
14  Pharmacies.   UCC-L operated as an independent contractor with
15  respect to TYY.

16      11.   UCC-M was a TYY marketer, based in California, who was
17  paid percentage-based commissions for facilitating the referral
18  of prescriptions for compounded drugs and other items reimbursed
19  by health care benefit programs to the TYY-Affiliated
20  Pharmacies.   UCC-M was affiliated with TYY, initially under an
21  independent contractor agreement, and later under a sham
22  employment agreement with Precise.

23      12.   UCC-N was a TYY marketer, based in Florida, who,
24  through AALS Consulting, was paid percentage-based
25  commissions for facilitating the referral of prescriptions for
26  compounded drugs and other items reimbursed by health care
27  benefit programs to the TYY-Affiliated Pharmacies.   UCC-N
28  operated as an independent contractor with respect to TYY.

13.   Defendant IRENA SHUT ("defendant SHUT") was a TYY marketer, based in Los Angeles, California, who, through Mise Marketing, was paid percentage-based commissions for facilitating the referral of prescriptions for compounded drugs and other items reimbursed by health care benefit programs to the TYY-Affiliated Pharmacies.  Defendant SHUT was affiliated with TYY, initially under an independent contractor agreement, and later under a sham consulting agreement with Concierge.

14.   UCC-O was a TYY marketer, based in California, who was paid percentage-based commissions for facilitating the referral of prescriptions for compounded drugs and other items reimbursed by health care benefit programs to the TYY-Affiliated Pharmacies.  UCC-O operated as an independent contractor under defendant SHUT, through Mise Marketing, initially, and later, with TYY directly.

15.   Defendant DOMENIC SIGNORELLI ("defendant SIGNORELLI") was a podiatrist licensed in California, who wrote compounded drug prescriptions for patients that were routed to the TYY-Affiliated Pharmacies for dispensing, in exchange for kickback payments from defendant SHUT.

16.   Defendant ROBERT JOSEPH ("defendant JOSEPH") was a podiatrist licensed in California, who wrote compounded drug prescriptions for patients that were routed to the TYY-Affiliated Pharmacies for dispensing, in exchange for kickback payments from defendant SHUT.

17.   UCC-P was a podiatrist licensed in Maryland, who wrote compounded drug prescriptions for patients that were routed to the TYY-Affiliated Pharmacies for

dispensing.   TYY would pay UCC-N and UCC-K percentage-based commissions for facilitating prescription referrals from UCC-P.

18.   UCC-Q was a physician licensed in Florida, who wrote compounded drug prescriptions for patients, including UCC-L and his family members, which were routed to the TYY-Affiliated Pharmacies for dispensing based on kickbacks and bribes paid to UCC-L and UCC-Q.   (UCC-A through UCC-Q are collectively referred to as "the UCCs", UCC-F through UCC-O are collectively referred to as the "TYY Marketing UCCs", and UCC-P through UCC-Q are collectively referred to as the "TYY Prescribing UCCs".)

B.   TRICARE

19.   TRICARE provided health care coverage for Department of Defense ("DoD") beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.

20.   Individuals who received health care benefits through TRICARE were referred to as TRICARE beneficiaries.   The Defense Health Agency ("DHA"), an agency of the DoD, was the military entity responsible for overseeing and administering the TRICARE program.

21.   TRICARE provided coverage for certain prescription drugs, including certain compounded drugs that were medically necessary and prescribed by a licensed physician.   Express Scripts, Inc. ("ESI") administered TRICARE's prescription drug benefits.

22.   TRICARE beneficiaries could fill their prescriptions through military pharmacies, TRICARE's home delivery program, network pharmacies, and non-network pharmacies.   If a

beneficiary chose a network pharmacy, the pharmacy would collect
any applicable co-pay from the beneficiary, dispense the drug to
the beneficiary, and submit a claim for reimbursement to ESI,
which would in turn adjudicate the claim and reimburse the
pharmacy.  To become a TRICARE network pharmacy, a pharmacy
agreed to be bound by, and comply with, all applicable State and
Federal laws, specifically including those addressing fraud,
waste, and abuse.

C.   DOL-OWCP

23.   The Federal Employees' Compensation Act, Title 5,
United States Code, Sections 8101, et seq. ("FECA") provided
certain benefits to civilian employees of the United States, for
wage-loss disability due to a traumatic injury or occupational
disease sustained while working as a federal employee (the "FECA
program").

24.   The Office of Workers' Compensation Programs ("OWCP"),
a component of the Department of Labor ("DOL"), administered the
FECA program, which was a federal workers' compensation program
focused on return to work efforts and was not a medical
insurance or a retirement plan.

25.   When a qualified employee suffered a work-related
injury, the employee filed a claim for coverage with OWCP, which
then assigned the claimant an OWCP claim number.

26.   To obtain reimbursement for prescription drugs
provided to OWCP claimants or beneficiaries, a pharmacy had to
submit its prescription claims for payment to OWCP, using the
beneficiary's OWCP claim number.  By submitting a claim for
reimbursement with OWCP, the pharmacy provider certified that

the service or product for which reimbursement was sought was medically necessary, appropriate, and properly billed in accordance with accepted industry standards.

27.   OWCP would process the claims submitted by the provider, and if all required information was included, OWCP would reimburse the provider in accordance with an established fee schedule.

D.   State Workers' Compensation System

28.   The California Workers' Compensation System ("CWCS") was a system created by California law to provide insurance covering treatment of injury or illness suffered by individuals in the course of their employment.   Under the CWCS, employers were required to purchase workers' compensation insurance policies from insurance carriers to cover their employees.   When an employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment to the relevant insurance carrier, which then paid the claim.   Claims were submitted to and paid by the insurance carriers either by mail or electronically.   The CWCS was governed by various California laws and regulations.

29.   The California State Compensation Insurance Fund ("SCIF") was a non-profit insurance carrier, created by the California Legislature, that provided workers' compensation insurance to employees in California, including serving as the "insurer of last resort" under the CWCS system for employers without any other coverage.

30.   California law, including the California Business and Professions Code and the California Insurance Code, prohibited

8

the offering, delivering, soliciting, or receiving of anything of value in return for referring a patient for medical items or services.

E.   Fiduciary Duties

31.   A "fiduciary" obligation generally existed whenever one person -- a client -- placed special trust and confidence in another -- the fiduciary -- in reliance that the fiduciary will exercise his or her discretion and expertise with the utmost honesty and forthrightness in the interests of the client, such that the client relaxed the care and vigilance which she or he would ordinarily exercise, and the fiduciary knowingly accepted that special trust and confidence and thereafter undertook to act on behalf of the client based on such reliance.

32.   Physicians, pharmacists, and pharmacy owners, among other medical professionals, owed a fiduciary duty to their patients and customers, requiring these fiduciaries to act in the best interest of the patients, and not for their own professional, pecuniary, or personal gain.  These fiduciaries owed a duty of honest services to their patients for decisions made relating to the medical care and treatment of those patients and customers, including the authorizing, prescribing, and dispensing of pharmaceuticals to such patients and customers.  Patients' and customers' right to honest services from these fiduciaries included the right not have the fiduciaries solicit or accept bribes and kickbacks connected to the medical care or treatment of such patients/customers.

F.   Health Care Programs

33.   Among other programs, Tricare and FECA were "federal

9

1  health care programs," as defined by 42 U.S.C. § 1320a-7b(f)

2  (collectively, the "Affected Federal Health Care Programs").

3      34.  The Affected Federal Health Care Programs, SCIF and

4  other state workers' compensation insurance carriers, along with

5  other public and private plans and contracts that Concierge and

6  Precise billed for compounded drug prescription reimbursements

7  were "health care benefit programs," as defined by 18 U.S.C.

8  § 24(b), that affected commerce (collectively, the "Affected

9  Health Care Plans").

10      G.    Compounded Drugs

11      35.  In general, "compounding" was a practice in which a

12  licensed pharmacist, a licensed physician, or, in the case of an

13  outsourcing facility, a person under the supervision of a

14  licensed pharmacist, combined, mixed, or altered ingredients of

15  a drug or multiple drugs to create a drug tailored to the needs

16  of an individual patient.  Compounded drugs were not FDA-

17  approved, that is, the FDA did not verify the safety, potency,

18  effectiveness, or manufacturing quality of compounded drugs.

19  The California State Board of Pharmacy regulated the practice of

20  compounding in the State of California.

21      36.  Compounded drugs were prescribed by a physician when

22  an FDA-approved drug did not meet the health needs of a

23  particular patient.  For example, if a patient was allergic to a

24  specific ingredient in an FDA-approved medication, such as a dye

25  or a preservative, a compounded drug would be prepared excluding

26  the substance that triggered the allergic reaction.  Compounded

27  drugs would also be prescribed when a patient could not consume

28  a medication by traditional means, such as an elderly patient or

1 │ a child who could not swallow an FDA-approved pill and needed

2 │ the drug in a liquid form that was not otherwise available.

3 │ II.  OBJECTS OF THE CONSPIRACY

4 │      37.  Beginning on an unknown date, but no later than in or

5 │ about November 2012, and continuing through at least in or about

6 │ June 2016, in Los Angeles County, within the Central District of

7 │ California, and elsewhere, defendant SHUT, defendant SIGNORELLI,

8 │ defendant JOSEPH, the UCCs, and others known and unknown to the

9 │ Grand Jury, knowingly combined, conspired, and agreed to commit

10 │ the following offenses against the United States:

11 │        a.  mail and wire fraud, in violation of Title 18,

12 │ United States Code, Sections 1341 and 1343;

13 │        b.  honest services mail and wire fraud, in violation

14 │ of Title 18, United States Code, Sections 1341, 1343, and 1346;

15 │        c.  health care fraud, in violation of Title 18,

16 │ United States Code, Section 1347;

17 │        d.  using the mails and interstate facilities in aid

18 │ of bribery, in violation of Title 18, United States Code,

19 │ Section 1952(a)(1) and (3);

20 │        e.  engaging in monetary transactions in property

21 │ derived from specified unlawful activity, in violation of Title

22 │ 18, United States Code, Section 1957;

23 │        f.  knowingly and willfully soliciting or receiving

24 │ remuneration in return for referring an individual for the

25 │ furnishing and arranging for the furnishing of any item or

26 │ service, and in return for arranging for and recommending

27 │ purchasing or ordering any good, service, or item, for which

28 │ payment may be made in whole or in part under a Federal health

1  care program, in violation of Title 42, United States Code,

2  Section 1320a-7b(b)(1); and

3        g.   knowingly and willfully offering to pay or paying

4  any remuneration to any person to induce such person to refer an

5  individual for the furnishing and arranging for the furnishing

6  of any item or service, and to arrange for and recommend

7  purchasing or ordering any good, service, or item, for which

8  payment may be made in whole or in part under a Federal health

9  care program, in violation of Title 42, United States Code,

10  Section 1320a-7b(b)(2).

11  III.  THE MANNER AND MEANS OF THE CONSPIRACY

12       38.   The objects of the conspiracy were carried out, and to

13  be carried out, in substance, as follows:

14        a.   UCC-A, UCC-B, UCC-C, UCC-D, and UCC-E

15  (collectively, "the TYY-Related Owners"), along with other co-

16  conspirators working with the TYY-Related Owners, would provide

17  kickbacks to the TYY Marketing UCCs, the TYY Prescribing UCCs,

18  and others (collectively, the "Kickback Induced Referral

19  Sources") in return for referring, arranging for, recommending,

20  and causing the referral of, pre-formulated prescriptions for

21  compounded drugs and other pharmaceuticals (collectively,

22  "Kickback Tainted Prescriptions") to the TYY-Affiliated

23  Pharmacies.  These kickbacks would include: (1) percentage-based

24  referral payments from TYY to the TYY Marketing UCCs in exchange

25  for arranging for, recommending, and causing the referral of

26  Kickback Tainted Prescriptions to the TYY-Affiliated Pharmacies;

27  and (2) items, services, and other things of value from TYY and

28  the TYY Marketing UCCs to the TYY Prescribing UCCs and other

health care professionals to induce the prescribing or authorization of Kickback Tainted Prescriptions for beneficiaries of the Affected Health Care Plans for dispensing at the TYY-Affiliated Pharmacies.

b.  In response to the promise of kickbacks, Kickback Induced Referral Sources would refer and cause the referral of Kickback Tainted Prescriptions to the TYY-Affiliated Pharmacies.

c.  The TYY-Affiliated Pharmacies would dispense compounded drugs and other pharmaceuticals authorized by the Kickback Tainted Prescriptions.

d.  The TYY-Affiliated Pharmacies would send compounded drugs and other pharmaceuticals, by mail, to patient-beneficiaries and submit claims for reimbursement to the Affected Health Care Plans.

e.  Medical professionals and others who were entrusted to exercise judgement and discretion in making decisions relating to the medical care and treatment of patients -- including the prescribing, authorizing, and dispensing of compounded drugs and other pharmaceuticals to patients -- owed a duty of honest services to those patients.  Medical professionals and others responsible for the medical care and treatment of these patients would deprive the patients of their right to honest services by soliciting, receiving, offering, and paying kickbacks to induce the referral of Kickback Tainted Prescriptions to the TYY-Affiliated Pharmacies, and by concealing these material facts.

f. To conceal and disguise the illegal nature of the inducements provided to Kickback Induced Referral Sources for Kickback Tainted Prescriptions, the TYY-Related Owners, along with other co-conspirators, would use TYY to insulate the TYY-Affiliated Pharmacies from payments to the TYY Marketing UCCs and the TYY Prescribing UCCs.

g. TYY would recruit "marketers," including defendant SHUT and the TYY Marketing UCCs, who would leverage pre-existing relationships and develop new ones with physicians and other health care professionals to generate Kickback Tainted Prescriptions for dispensing at the TYY-Affiliated Pharmacies. Defendant SHUT and several of the TYY Marketing UCCs, including UCC-F, UCC-G, UCC-I, UCC-K, UCC-L, UCC-N, and UCC-O, would offer inducements to the TYY Prescribing UCCs to generate prescription referrals.

h. Using "marketing" contracts to disguise the true nature of the payments, including independent contractor, employment, and consulting agreements, TYY would pay marketers: (a) a percentage of the amount the Affected Health Care Plans reimbursed the TYY-Affiliated Pharmacies for each Kickback Tainted Prescription; or (b) starting in mid-2016, a purported "fixed" amount established and adjusted to replicate a percentage of such reimbursements. These payments to marketers would be made primarily -- or entirely, depending on the circumstances -- for the generation and steering of Kickback Tainted Prescriptions to the TYY-Affiliated Pharmacies, rather than any purported "marketing" or advertising-related services identified in the respective agreements.

1          i.   Based on the referral fees the TYY-Related

2   Owners, through TYY, offered "marketers," defendant SHUT and the

3   TYY Marketing UCCs would:

4               (1)   solicit physicians to authorize

5   prescriptions of unfamiliar combinations of compounded drugs and

6   other custom pharmaceuticals;

7               (2)   present prescribing physicians with pre-

8   printed prescriptions for compounded drug combinations or

9   formularies specifically selected to maximize the amount the

10  Affected Health Care Plans would reimburse for each

11  prescription, without regard for the medical efficacy of the

12  formulary; and

13              (3)   falsely inform prescribing physicians that

14  beneficiaries would not be responsible for any "out-of-pocket"

15  costs associated with the prescribed compounded drugs and

16  pharmaceuticals.  In reality, nearly all of the Affected Health

17  Care Plans (with the exception of workers' compensation

18  programs) required patients to contribute a co-payment ("co-

19  pay") amount towards the prescription cost.  As the co-

20  conspirators well knew, health care benefit programs reimbursed

21  prescription claims on the express understanding that patients

22  made any applicable co-pay to the dispensing pharmacy, or,

23  alternatively, that the pharmacy provider prepared and

24  maintained hardship exception paperwork providing good faith

25  justification for uncollected patient co-pays.

26  ///

27  ///

28  ///

j.   Defendants SIGNORELLI and JOSEPH and other TYY Prescribing UCCs would receive kickbacks and bribes from defendant SHUT and other TYY Marketing UCCs as inducements to authorize Kickback Tainted Prescriptions.

k.   The TYY-Related Owners would also induce medical professionals to authorize prescriptions.  These inducements would be concealed through various arrangements, including:

(1)   The management of in-office pharmacy dispensing programs for certain TYY Prescribing UCCs where management fees would be discounted to provide such physicians. with kickbacks and bribes.  The calculation of the discounted management fee, and the corresponding inducement, would be based on the physician's volume of compounded drug prescriptions, despite the fact that the compounded drug prescriptions would be dispensed by the TYY-Related Pharmacies and wholly unrelated to any physician's in-office dispensing program;

(2)   The use of a financial transaction referred to as "factoring," or more specifically, "accounts receivable factoring," where TYY would purchase all or a portion of the accounts receivable of certain TYY Prescribing UCCs paying substantially above fair market value to incentivize TYY Prescribing UCCs to write compounded drug prescriptions; and

(3)   The offering of prostitutes, expensive meals, valuable event tickets, and other items of value.

l.   Based on these undisclosed inducements, the TYY Prescribing UCCs and defendants SIGNORELLI and JOSEPH, would authorize the pre-printed prescriptions for compounded drugs: (a) with no prior physician/patient relationship with the

16

beneficiaries; (b) without the knowledge or consent of the purported beneficiaries; and/or (c) without meaningfully considering a far less expensive FDA-approved (i.e., non-compounded) prescription drug for the patient.

m.    In order to pay the Kickback Induced Referral Sources for the Kickback Tainted Prescriptions, the TYY-Related Owners, and other co-conspirators, would cause Concierge and Precise to engage in financial transactions using reimbursements from the Affected Health Care Plans.  These reimbursements would be paid to the TYY-Affiliated Pharmacies based on insurance billings and corresponding reimbursements on Kickback Tainted Prescriptions (collectively, the "Health Care Fraud ('HCF') and Kickback Proceeds").  As the TYY-Related Owners and many of the TYY Marketing UCCs and TYY Prescribing UCCs then knew and understood, HCF and Kickback Proceeds paid to Kickback Induced Referral Sources -- commonly exceeding $10,000 -- would be made circuitously from the TYY-Affiliated Pharmacies to TYY and then to the referral source to conceal and disguise the nature, source, ownership, and control of the HCF and Kickback Proceeds from the Affected Health Care Plans and corresponding pharmacy benefit managers, patient-beneficiaries, regulatory bodies, and others.

n.    As the TYY-Related Owners, TYY Marketing UCCs, TYY Prescribing UCCs, and other co-conspirators knew and intended, and as was reasonably foreseeable to them, in obtaining Kickback Tainted Prescriptions, operating the TYY-Affiliated Pharmacies to dispense Kickback Tainted Prescriptions

1  and submitting claims for reimbursement using the mails,
2  interstate wire communications, and other facilities in
3  interstate commerce, the TYY-Related Owners, the TYY Marketing
4  UCCs, the TYY Prescribing UCCs, defendants SHUT, SIGNORELLI, and
5  JOSEPH, as well as other co-conspirators, would conceal material
6  information from patient-beneficiaries and the Affected Health
7  Care Plans, including the fact that the TYY-Related Owners
8  offered, paid, and caused to be paid, and the Kickback Induced
9  Referral Sources solicited, received, and caused to be solicited
10  and received, kickbacks and bribes for the referral of Kickback
11  Tainted Prescriptions to the TYY-Affiliated Pharmacies.

12  o.   In order to track referral fees, the TYY-Related
13  Owners, along with other co-conspirators, would make several
14  arrangements, including using computer software programs, such
15  as DigitalRX, for billing and prescription tracking, and for
16  giving the TYY Marketing UCCs access to data to facilitate the
17  tracking of referral fees.  This data would include for each
18  prescription the "marketer," prescriber, and health care benefit
19  program applicable to the beneficiary and prescription,
20  including the Affected Federal Health Care Programs, such as
21  TRICARE and the FECA program.

22  IV.   EFFECTS OF THE CONSPIRACY

23  39.   By concealing the true facts regarding the Kickback
24  Tainted Prescriptions from the Affected Health Care Plans, the
25  co-conspirators prevented the Affected Health Care Plans from
26  subjecting the claims to additional review, paying lesser
27  amounts on the claims, and in some instances rejecting the
28  claims altogether.

40.   In furtherance of the conspiracy, co-conspirators caused Concierge and Precise to submit claims for reimbursement on Kickback Tainted Prescriptions seeking in excess of $250 million from the Affected Health Care Plans.

41.   As result of these claims, between in or about November 2012 and in or about June 2016, the Affected Health Care Plans paid Concierge approximately $117,675,261 for Kickback Tainted Prescriptions, and between in or about January 2013 and in or about June 2016, paid Precise approximately $56,901,662 for Kickback Tainted Prescriptions.

42.   In furtherance of the conspiracy, between in or about April 2014 and July 2016, co-conspirators caused TYY to pay defendant SHUT approximately $6,789,000.   In turn, and in furtherance of the conspiracy, defendant SHUT paid defendant SIGNORELLI approximately $885,000, through two members of defendant SIGORELLI's family, in exchange for authorizing Kickback Tainted Prescriptions, which were dispensed at the TYY-Related Pharmacies, and for which the Affected Health Care Plans reimbursed the TYY-Related Pharmacies approximately $14 million.

43.   In furtherance of the conspiracy, between in or about April 2014 and July 2016, defendant SHUT paid defendant JOSEPH approximately $332,500, through defendant JOSEPH's mother, in exchange for defendant JOSEPH authorizing Kickback Tainted Prescriptions, which were dispensed at the TYY-Related Pharmacies, and for which the Affected Health Care Plans reimbursed the TYY-Related Pharmacies approximately $1.3 million.

V.    OVERT ACTS

44.    In furtherance of the conspiracy and to accomplish its objects, on or about the following dates, the TYY Related Owners, the TYY Marketing UCCs, the TYY Prescribing UCCs, defendants SHUT, SIGNORELLI, and JOSEPH, and other co-conspirators known and unknown to the Grand Jury, committed, willfully caused others to commit, and aided and abetted the commission of the following overt acts, among others, within the Central District of California and elsewhere:

Overt Act No. 1:    On or about December 1, 2012, UCC-D caused Concierge to issue check number 1073 from a Wells Fargo Bank account bearing a number ending in 7686 (the "7686 Wells Fargo Acct"), in the approximate amount of $190,992, to TYY.

Overt Act No. 2:    On or about December 13, 2012, UCC-J sent an email to UCC-A and UCC-C, among others, with the subject line "Dr's sending in scripts not showing up." UCC-J explained:

We have doctors sending in scripts that are not showing up in our payout. Please look at reassign these. Someone is getting credit for them and shouldn't be. Please make sure these are added to our payout for the last 2 months of scripts.

In the email, UCC-J provided the names of seven prescribing physicians, including physicians who wrote prescriptions reimbursed by the Affected Federal Health Care Programs.

Overt Act No. 3:    On or about December 19, 2012, UCC-A sent an email with the subject line "Orlando Magic info," to other TYY-Related Owners, discussing the purchase of approximately 38 Orlando Magic tickets for "marketing purposes,"

for a purchase price of approximately $13,052.   In the email, UCC-A named three "marketers," including UCC-L, and stated that these "marketers" were asking if the TYY-Related Owners would buy seats that include food and beverage to utilize for marketing.   UCC-A noted that the "marketers" had increased their numbers from $150,000 to $200,000 per month and were looking to increase volume.   In a reply email, UCC-B added, "I think we should do it.   We need as much business as possible with the loss of [a deceased marketer]."

Overt Act No. 4:   On January 4, 2013, UCC-A sent an email to UCC-D and another Concierge employee, noting: "FYI [UCC-F] DID 900k+ HE IS A GOLDEN GOOSE KEEP HIS SHIT FLOWIN."

Overt Act No. 5:   On June 3, 2013, UCC-A sent an email to UCC-E and UCC-C, writing:

"REMINDER GUYS PLEASE.   [UCC-P] WHO IS A VERY BIG PRESCRIBER WANTS THIS STUFF THAT HE WAS PREVIOUSLY GETTING FROM VALLEY VIEW.   PLEASE YOU REALLY NEED TO GET THIS INF[ORMATION] TOGETHER AND TEST REIMBURSEMENTS AND TELL ME QUICKLY IF THESE ARE DOBBLE [sic]. PLEASE DON'T LAG."

An email from UCC-P's surgical coordinator that included compound drug prescription formulas UCC-P previously referred to another pharmacy was attached to UCC-A's email.

Overt Act No. 6:   On June 13, 2013, UCC-J caused a Concierge employee to send an email to UCC-C, writing: "This is what UCC-J is sending to our patients," with a sample letter attached to the email.   The attached letter read:

Dear (patient), Concierge Pharmacy has been trying to get in touch with you to refill your prescription that (doctor

1    name) wrote for you. The current number we have for you may

2    be incorrect. (Doctor Name) would like for you to continue

3    the treatment plan he has for you with refills for your

4    prescription. If you have already received your most recent

5    refill please disregard this letter. If not, please contact

6    our refill department. Sincerely, Concierge Pharmacy Refill

7    Department.

8    In response to reviewing the letter UCC-J was sending to

9    patients on behalf of Concierge regarding refills, UCC-C

10   responded: "Fuck No."  When the Concierge employee then asked

11   UCC-C, "Okay, so what should I tell him?", UCC-C responded, "Say

12   this is illegal."

13      Overt Act No. 7:    On or about June 18, 2013, UCC-C sent

14   an email to the other TYY-Related Owners and two Concierge

15   employees concerning wound care and scar cream prescription pad

16   formularies.  In the email, titled "Re: New pad," UCC-C detailed

17   the ingredient changes, as follows: "FCL to KFCL...Ketoprofen

18   10, Fluribiprofen 10, Cyclo 4, Lido 5 [describing the compound

19   medication formulary ingredients]... FBCGL to FKBCGL…Ketoprofen

20   10, flubi 10, baclo 2, gaba 6, lido 2."

21      Overt Act No. 8:    On or about July 12, 2013, after a

22   Concierge employee emailed the TYY-Related Owners inquiring:

23   "What do we say when a patient brings in an EOB to the doctor

24   showing that we billed $3000 for a compound and the patient is

25   upset?," UCC-A responded: "No returns." and UCC-C replied:

26      We say we don't have control of what the drug companies

27      have set the pricing for these compounds.  All we do is

28

1    process it through insurance and if it's not covered we

2    send a FREE emergency supply.

3    Overt Act No. 9:    On or about July 17, 2013, a Concierge

4    employee sent an email to UCC-A and UCC-D, stating:

5        Hi Fred, I am sending this email for [a TYY Marketing UCC].

6        She is doing a convention here and many of the doctors we

7        have signed up will be attending.  She will obviously be

8        entertaining for a couple nights.  She was talking with

9        [UCC-A] and trying to come up with a way to get a credit

10       card, since she tells me that at some venues credit cards

11       (not cash) are a must. . . .

12   UCC-A responded: "Yes [UCC-D,] we should get her a pre paid card

13   in case she takes them out etc. for the convention.  We can go

14   over this Monday though."

15   Overt Act No. 10:    On or about August 13, 2013, UCC-J sent

16   an email to UCC-A and UCC-C, writing:

17       If you want to increase your revenue, particularly on

18       refills, I have a new proposal. You give me the reps to

19       manage.  Anybody over 200K in gross, you pay me 5% on.

20       Anyone below 200K, you pay me as you do now on my %'s.  But

21       I manage them ALL.  Texas big wigs too.  You will see an

22       increase in your revenue 10 fold this way.  Also, you are

23       going to have to pay me 45% on everything minus Triad.

24   Overt Act No. 11:    On or about October 4, 2013, UCC-G sent

25   an email to UCC-F, which UCC-F forwarded to UCC-A and UCC-B.

26   The email from UCC-G highlighted complaints received from Blue

27   Cross Blue Shield (BCBS) federal patient-beneficiaries.  The

28   email explained that patients were complaining that they were

23

1  not receiving their prescription medications, even though BCBS
2  had already been billed for the prescriptions.

3      Overt Act No. 12:   On or about October 9, 2013, UCC-A sent
4  an email to other TYY-Related Owners and two Concierge employees
5  concerning making arrangements to provide a car for UCC-P to
6  entertain other prescribing physicians in Las Vegas, Nevada.

7      Overt Act No. 13:   On October 23, 2013, a Concierge
8  employee emailed the TYY-Related Owners, writing:

9      THIS IS FOR ANYONE, CHRISTINE ([UCC-K's] ASSISTANT) CALLED
10  ME SAYING THAT [UCC-P] WANTS ONE OF YOU TO CALL HIM TODAY.
11  HE NEEDS SOMEONE TO CLARIFY WHY HE SENT IN A 100 SCRIPTS
12  AND ONLY 20 APPROVED.  HE WANTS ONE OF YOU TO SPEAK WITH
13  HIM. HE REQUESTED THAT SPECIFICALLY.

14      Overt Act No. 14:   On or about October 30, 2013, UCC-C
15  sent an email to several Concierge employees and other TYY-
16  Related Owners, writing:

17      I say forget the 3 stupid call rules. If the Rx goes
18  through and we still haven't contacted the patients.  Then
19  just send the Rx to patient.  Let's not lose our customers
20  and have physicians pissed at us.  Call and if no answer
21  and medication went through insurance, ship it out.
22  As part of the same email chain, UCC-A inquired: "What if it is
23  a large copay?"  UCC-B replied: "Ship ship ship."

24      Overt Act No. 15:   On or about November 27, 2013, UCC-F
25  and the TYY-Related Owners engaged in an email exchange
26  concerning the purchase of a condominium in the Dominican
27  Republic for UCC-F, in the amount of approximately $500,000.

28

Overt Act No. 16:   On or about December 9, 2013, UCC-F
sent an email to UCC-A and UCC-C, writing:

> We did only a couple months of CC [referring to compounding
> creams] in 2012.  Less than $1M in income for me.  In 2013,
> I am very close to $5.5M in CC commissions.  Without CC
> [compounding creams] my 2013 revenue is $2.7M (not exact
> but very good estimate). 2012 is closer to $2.5M.

Overt Act No. 17:   On or about December 25, 2013, co-
conspirators caused TYY to pay $70,000 to UCC-H, from a Wells
Fargo bank account bearing a number ending in 2106 (the "2106
Wells Fargo Acct"), for the purchase of 3 Miami Dolphins
football suites to be used to entertain prescribing physicians.

Overt Act No. 18:   On or about December 29, 2013, co-
conspirators caused TYY to pay $29,500 to UCC-H from the 2106
Wells Fargo Acct for the purchase of a watch to be given to a
TYY Prescribing UCC.

Overt Act No. 19:   On or about March 21, 2014, UCC-K sent
an email to UCC-H, UCC-A, and UCC-B, attaching a prescription
formulary sheet, and writing:  "Guys here is another RX from
express RX.  I just hired a rep from there company.  He
collected $25K in one week.  There [sic] pain swelling cream
number one is paying $9K PLEASE RUN SOME FORMULAS AND FIND US
SOME PAYERS."

Overt Act No. 20:   On or about May 21, 2014, defendant
SHUT wrote a check for $18,000 from Mise Marketing to defendant
JOSEPH's mother, in exchange for defendant JOSEPH's
authorization of Kickback Tainted Prescriptions.

Overt Act No. 21:   On or about July 21, 2014, UCC-F requested the TYY-Related Owners place his employee, UCC-G, on the TYY payroll, as an inducement to UCC-F to continue to generate prescription referrals.

Overt Act No. 22:   On or about July 22, 2014, UCC-F sent an email to UCC-A, UCC-B, and UCC-C, with the subject "Re: DME/[UCC-G]/Medicare," explaining:

> For MC business . . . i'm sure that attorneys will tell us that we need to make it close to 'fair market value'.  How does $5k/month ($60k annual salary) sound plus 20% commission (from my normal 28%) for the MC orders.  If I don't make enough to cover the salary you can deduct from my normal commissions.  I think that might be a good solution for other reps that we want to bring in for MC bracing, lab etc . . . thoughts?  Maybe for them do $3k/month and adjust their commissions a bit like me . . . commissions paid as bonus.

Overt Act No. 23:   On or about July 24, 2014, defendant SHUT sent an email to UCC-C describing TYY's payments for the benefit of defendant SIGNORELLI, who referred Kickback Tainted Prescriptions to the TYY-Affiliated Pharmacies.  The payments included $288 for a limousine service that picked up defendant SIGNORELLI at his residence and transported him to the BOA Restaurant, located in West Hollywood, California, where defendant SIGNORELLI's dinner bill totaled approximately $1,698, which was also paid by TYY.

Overt Act No. 24:   On August 28, 2014, UCC-L caused Lily Medical LLC, a durable medical equipment and supplies company,

1   to file its articles of organization with the Florida Secretary
2   of State.

3       Overt Act No. 25:   On or about September 3, 2014, UCC-B
4   caused Concierge to issue check number 2044 from the 7686 Wells
5   Fargo Acct, in the amount of $1,250,000, to TYY.

6       Overt Act No. 26:   On or about September 30, 2014,
7   defendant SHUT sent an email to UCC-A and UCC-C, writing, in
8   part, "Help."  The email forwarded another email from an
9   employee of defendant SIGNORELLI, which cautioned defendant SHUT
10  to be "aware of the issues with the labor dept."  The forwarded
11  email included a faxed letter from the medical director of the
12  TSA workers' compensation case management program to defendant
13  SIGNORELLI, which expressed concern over defendant SIGNORELLI's
14  then-ongoing and frequent prescribing of costly compounded
15  topical medications to a TSA employee who had returned to duty
16  eighteen months earlier, with no difficulty or issues involving
17  his prior foot injury.

18      Overt Act No. 27:   On or about October 17, 2014, UCC-A
19  caused TYY to issue check number 4846 to the Washington Wizards
20  from the 2106 Wells Fargo Acct, in the amount of $12,325, for
21  the purchase of professional basketball tickets for UCC-F to
22  entertain TYY-affiliated prescribers.  The memo line of the
23  check reads: "50% deposit on tickets."

24      Overt Act No. 28:   On or about November 6, 2014, UCC-D
25  caused Concierge to issue check number 1184 from the 7686 Wells
26  Fargo Acct, in the amount of $1,250,000, to TYY.

27      Overt Act No. 29:   On or about November 20, 2014,
28  defendant SHUT wrote a check for $16,000 from Mise Marketing to

1 | defendant JOSEPH's mother, in exchange for defendant JOSEPH's
2 | authorization of Kickback Tainted Prescriptions.

3 |     Overt Act No. 30:   On or about November 20, 2014,
4 | defendant SHUT wrote a check for $45,000 from Mise Marketing to
5 | a family member of defendant SIGNORELLI, in exchange for
6 | defendant SIGNORELLI's authorization of Kickback Tainted
7 | Prescriptions.

8 |     Overt Act No. 31:   On or about November 26, 2014, UCC-E
9 | sent an email to UCC-L, writing:

10 |     When the girls called the patients told them either nobody
11 |     called them and they don't need refills or they said they
12 |     have already said they don't want refills.  So if that's
13 |     the case why are these refills on your refill log when
14 |     patients clearly have said they do not want any refills???
15 | UCC-L replied, "There were multiple patients that said they
16 | didn't want it due to costs but when we explained we have a
17 | hardship program they were interested."

18 |     Overt Act No. 32:   On December 31, 2014, UCC-B caused TYY
19 | to issue check number 5054 from the 2106 Wells Fargo Acct to the
20 | Washington Wizards, in the amount of $12,325, for the purchase
21 | of sporting event tickets provided to UCC-F to entertain TYY
22 | Prescribing UCCs and others.  The memo line of the check read:
23 | "Final 50% deposit on tickets."

24 |     Overt Act No. 33:   On or about February 6, 2015, UCC-B
25 | sent a group text to UCC-E, defendant SHUT, and a Concierge
26 | employee regarding defendant SIGNORELLI.  In the text, UCC-B
27 | sent a screen shot of a text message from defendant SIGNORELLI.
28 | UCC-B indicated that defendant SIGNORELLI had given blanket

authorization for refills in perpetuity for all of his patients with prescriptions dispensed at the TYY-Affiliated Pharmacies. Defendant SIGNORELLI also advised that TYY representatives should only contact him directly and not contact his office staff regarding refills and other questions pertaining to prescriptions.

Overt Act No. 34:   On or about February 25, 2015, co-conspirators caused Precise to issue check number 5163 from the Chase Bank account number ending in 5150 (the "5150 Chase Acct"), in the amount of $400,000, to TYY.

Overt Act No. 35:   On or about March 10, 2015, co-conspirators caused Precise to issue check number 1357 from the 5150 Chase Acct, in the amount of $1,500,000, to TYY.

Overt Act No. 36:   On or about March 20, 2015, defendant SHUT wrote a check for $60,000 from Mise Marketing to a family member of defendant SIGNORELLI, in exchange for defendant SIGNORELLI's authorization of Kickback Tainted Prescriptions.

Overt Act No. 37:   On or about July 21, 2015, UCC-B, UCC-G, and a Concierge employee participated in a group text message chain.  As part of the text chain, UCC-G wrote: "Ben-I'm gonna send u a boat load of patients-can we test run claims to see what's covered on these patients."  The Concierge employee responded:   "yeah."

Overt Act No. 38:   On or about April 25, 2016, UCC-D sent an email to UCC-J, attaching a Concierge Employee Handbook, HIPPA form, I-9 form, W-4, and Direct Deposit forms.  UCC-D added: "Congratulations on coming aboard.  Please fill all

1  applications and return to me to get you started as new

2  employee."

3     Overt Act No. 39:   On or about May 10, 2016, UCC-J sent an

4  email to UCC-D, writing:

5        Basically DOL is about the only thing paying.  However, I

6        have a billing company I know that is doing wc billing for

7        pharmacies and making a killing for pharmacies.  They also

8        do some wc billing for me.  They can collect on at least

9        60% of this report.  I would like to be the guinea pig for

10       you guys to try them.  I know my adjudications will go up

11       and you will make more money than doing this ourselves.

12    Overt Act No. 40:   On or about May 16, 2016, the TYY-

13 Related Owners issued employment agreements to UCC-I and his

14 wife, who were purported employees of Precise.

15    Overt Act No. 41:   On or about June 15, 2016, a Concierge

16 employee sent an email to UCC-J, UCC-D, and another individual,

17 with the subject line "RE: Commission Payment."  The Concierge

18 employee wrote:

19       Commissions will no longer be coming from Tyy Consulting,

20       as TYY has been dissolved as of May 1, 2016, so commissions

21       will no longer be paid out on the 15th of the month.  Once

22       all the paperwork has been signed and returned to CCRX

23       (which I believe as of today it has been returned) then

24       [UCC-D] will assign a representative from CCRX to have the

25       reports to you on a regular basis."

26    Overt Act No. 42:   On or about June 1, 2016, UCC-F entered

27 into a consulting services agreement with Concierge, through

28 Meditech Inc., for a $75,000 monthly salary, purportedly

covering various marketing and advertising services, including "assistance in the preparation of marketing materials," "consultation on pharmacy operations," "develop[ing] marketing strategies," "provid[ing] educational sessions for physicians and other healthcare providers," and "provid[ing] consultation on federal and state rules and regulations."

FORFEITURE ALLEGATION

[18 U.S.C. §§ 982(a)(7), 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

45.   Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given to defendants SHUT, SIGNORELLI, and JOSEPH (collectively, the "defendants") that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Count One of this Indictment.

46.   Defendants shall forfeit to the United States the following property:

a.   all right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense set forth in Count One of this Indictment; and

b.   a sum of money equal to the total value of the property described in subparagraph a.  If more than one defendant is found guilty under Count One of this Indictment, each such defendant found guilty shall be liable for the entire amount forfeited pursuant to Count One of this Indictment.

47.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), each defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof

(a) cannot be located upon the exercise of due diligence;
(b) has been transferred, sold to or deposited with a third
party; (c) has been placed beyond the jurisdiction of the Court;
(d) has been substantially diminished in value; or (e) has been
commingled with other property that cannot be divided without
difficulty.


A TRUE BILL


/s/
_____
Foreperson


NICOLA T. HANNA
United States Attorney


LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

STEPHEN A. CAZARES
Assistant United States Attorney
Deputy Chief, Major Frauds Section

ASHWIN JANAKIRAM
Assistant United States Attorney
Major Frauds Section